Electronically Filed
Intermediate Court of Appeals
CAAP-13-0005494
19-JAN-2017
08:43 AM

NO. CAAP-13-0005494

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAI'I


TIFFANY LEI PAREL, Appellant-Appellant, v.
DEPARTMENT OF HUMAN SERVICES,
STATE OF HAWAII, Appellee-Appellee


APPEAL FROM THE CIRCUIT COURT OF THIRD CIRCUIT
(CIVIL NO. 12-1-0644 (GKN))


MEMORANDUM OPINION
(By:  Fujise, Presiding Judge, Leonard and Reifurth, JJ.)


In this secondary appeal, Plaintiff-Appellant Tiffany Lei Parel (**Parel**) appeals from the October 22, 2013 Judgment (**Judgment**), and challenges the August 30, 2013 Order Affirming Administrative Hearing Decision Dated November 30, 2012 (**Order**), both entered in favor of State of Hawai'i Defendant-Appellee Department of Human Services (**DHS**) and against Parel, in the Circuit Court of the Third Circuit (**Circuit Court**).[1]  In the proceedings below, a DHS investigation determined that Parel neglected a 74-year old female resident (**Client**) at Hale Ho'ola Hamakua nursing facility (**Facility**).  After an evidentiary

---

[1]  The Honorable Greg K. Nakamura presided.

hearing, a hearing officer from the Administrative Appeals Office of DHS submitted a Notice of Administrative Hearing Decision (**Hearing Decision**), which included findings of fact and concluded that DHS had correctly confirmed neglect by Parel. The Circuit Court affirmed the Hearing Decision.

I.    BACKGROUND

In 2005, Parel secured employment as a Certified Nurse's Aid (**CNA**) with the Facility. Parel was responsible for transferring patients in and out of bed, helping patients shower, taking vitals, helping patients in their daily living, feeding patients, and changing patients.

On July 18, 2012, the Adult Protective and Community Services Branch of DHS (**APS**) received a report alleging that Client had fallen while under the care of Parel (**Abuse Report**). The Abuse Report provided that Client fell and sustained two black eyes, a skinned knee, and a left shoulder fracture. The Abuse Report was accepted for investigation by DHS, and an APS social worker conducted an investigation.

On July 23, 2012, APS received a copy of the Department of Health's Office of Healthcare Assurance report from Director of Nursing Carmela Rice (**Rice**), and Nurse Manager Chelseamay Holley (**Holley**) (**DOH report**). The DOH report included Parel's handwritten statement, dated July 17, 2012, and typed statement, dated July 18, 2012. In her statements, Parel related that she placed Client on the right side of the bed and, as she was reaching for Client's gait belt at the end of the bed, "[Client]

2

started shaking rapidly. Her whole body got stiff and lunged front and fell to the ground."

The DOH report also included a statement from Client's daughter, Melanie Mamhot (**Mamhot**). Mamhot related that Parel told her two versions of how Client fell. In the first version, Parel told Mamhot that Client was in a seated position prior to her fall. In the second version, Parel told Mamhot that Client was standing prior to her fall.

The DOH report also included Licensed Practical Nurse Monalisa Batalona's (**Batalona**) statement. On the day of the incident, Batalona related that Parel entered Client's room and "about a minute later, [Parel] was yelling for me." When Batalona entered Client's room, she observed Client on the ground. Batalona related that "[Parel] told [her] that [Client] was standing up and she was holding her hands . . . transferring her to shower chair. Then [Client] started to seized [sic] and fell to the floor." When asked "[d]id you notice if she had the gait belt on[,]" Batalona responded, "[n]o, she did not have it on, because I did not see it on her when we transferred her back to the bed." When asked "[d]id you see the gait [belt] on the bed or floor," Batalona answered, "[n]o, I did not notice where the gait belt was."

On July 23, 2012, APS visited Client at the Facility. APS attempted to interview Client about the fall on July 14, 2012. However, when Client was asked questions about the fall, she "laughed, showing clear signs of confusion[.]" As such, APS determined that Client was not able to participate in the

interview. APS photographed Client's "right forehead hematoma, facial bruising, bruising on both hands, and right knee abrasion."

On July 27, 2012, and July 30, 2012, APS interviewed staff at the Facility about Client's fall, "their knowledge about and experience with [Client,] and the procedure they would follow in transferring [Client.]" APS interviewed Carmelita Acob, Nori Acidera, Beverly Nacnac, Alice Saturay, Tina Tabucbuc, Clarence Augustin, Judyvon "Von" Ganir, and Paskislina Steele.

On July 31, 2012, APS interviewed Parel. Parel related that on July 14, 2012, she entered Client's room "with the shower chair and grabbed [Client's] clothes and gait belt." Parel related that the "gait belt was on her right, near the foot of the bed[.]" As Parel reached for the gait belt with her right hand, she "saw 'something' to her left." Parel "gestured that her head was turned to the right, away from [Client.]" Parel explained that she "initially said [Client] was standing because she saw movement from the left." Parel declined APS's request to provide a written statement. Instead, Parel amended her July 17, 2012 statement to add that she reached for the gait belt with her right hand.

On August 7, 2012, APS interviewed Batalona via telephone. Batalona related that on the day of Client's fall, she entered Client's room and observed Client "on the floor, body shaking, eyes rolled back and tongue sticking out." Batalona related that the "shower chair was near the foot of the bed, about a foot away and [Client] did not have the gait belt on."

Batalona stated that "she did not see a gait belt on the foot of the bed, anywhere on the bed, or on the floor." Batalona reiterated that Parel "stated that she was transferring [Client] to the shower chair, had [Client] standing in a hand held grasp, when [Client's] legs stiffened up and she fell forward." Batalona related that "she had no reason to lie (about CNA Parel) [and that] she was reporting exactly what happened."

On August 21, 2012, APS visited the Facility and photographed Client's room. APS also asked Rice and Holley to demonstrate how they would transfer a Client "from bed to shower chair and from bed to ambulation." Following the demonstration, APS concluded that if Parel "stood in front of [Client] while [Client] sat on the right side of the bed, CNA Parel could have prevented [Client's] fall, even if CNA Parel reached for the gait belt at the foot of the bed[.]" Additionally, APS concluded that the "use of the gait belt during transfers from the bed and during ambulation is a necessary device . . . and failure to use this device would have placed [Client] at a high risk for fall and injury[.]" Based on the demonstration, APS concluded that Client was most likely standing (as Parel had informed Batalona and Mamhot), without the gait belt on.

Following the investigation, DHS issued a Notice of Disposition Adult Protective Services Investigation (**Notice of Disposition**) on September 4, 2012. The Notice of Disposition confirmed caregiver neglect by Parel under Hawai'i Administrative Rules (**HAR**) § 17-1421-9.1(c) (2009).

On or about September 7, 2012, Parel requested an administrative hearing to contest DHS's determination of caregiver neglect.

On October 22, 2012, DHS issued its Notice of Videoconference Hearing (**Hearing Notice**), notifying Parel that the hearing was scheduled for November 8, 2012. The Hearing Notice provided that the "hearing will be held on an informal basis in accordance with Chapter 91 of the Hawaii Revised Statutes [(HRS)] and Chapters 17-2 and 17-1402 of the [HAR]."

An Internal Communication Form (**ICF**) was attached to the Hearing Notice. The ICF provided a detailed description of DHS's investigation, and DHS's position statements. DHS's position was that Parel was "'negligent' in [Client] care by not following the proper procedure in transferring the [Client] from the bed to shower chair, which resulted in the [Client] falling and suffering injury to [Client's] head, knee, hand, and shoulder." DHS's position was that "Parel's actions meet the HRS 346-222 definition of 'caregiver neglect' as she failed to exercise a degree of care for a vulnerable adult that a reasonable person would have done as outlined in [Client] contractual duties."

On November 8, 2012, an administrative hearing (**Hearing**) was held via video conference before Clayton Kimoto, Hearing Officer for the Administrative Appeals Office of DHS (**Hearing Officer**). At the beginning of the Hearing, the Hearing Officer related that he was not involved in DHS's investigation, and that his decision would be based on the evidence presented at

the Hearing. The Hearing Officer informed Parel that she has "the right to inspect and cross-examine the evidence submitted by [DHS.]" The Hearing Officer explained that "everyone who gives testimony at this hearing must tell the truth and nothing but the truth." The Hearing Officer stated that DHS "will give its presentation first, and then, Ms. Parel, you can, through your attorney or whoever, you can ask questions, cross-examine, or make your presentation[.]" The Hearing Officer then read exhibits into the record.

DHS Supervisor Timothy Kitagawa (**Kitagawa**) presented evidence on behalf of DHS. Kitagawa summarized DHS's investigation, and reiterated DHS's position. Next, Parel's counsel called APS Specialist Laron Kageyama (**Kageyama**) as his first witness. Kageyama testified that he has worked for APS for seven years. Kageyama related that he conducts four to five investigations a month. Kageyama could not confirm whether Client's seizure occurred before or after her fall. Kageyama related that Mamhot and Batalona's statements varied from Parel's statements about Client's fall. Kageyama testified that Batalona related that Client was not wearing a gait belt, and that she "did not notice where the gait belt was." Kageyama confirmed that Batalona was the only witness who stated that the gait belt was not on the bed or floor. Kageyama was aware that there was animosity between Parel and her coworkers. Kageyama explained that he was cautious and only used statements from coworkers that "appeared to be factual."

Parel also testified at the Hearing. Parel testified that she started working at the Facility in 2005. Parel related that on July 14, 2012, she was going to help Client take a shower. Parel placed Client in a seated position, and reached for the gait belt that was "hanging on the closet." Parel testified that as she "reached over to grab the gait belt, that's when I saw [Client] standing -- like I saw in the side of my eye she was standing, and then when I turned around she was just like . . . [h]aving a seizure[.]" Parel related that she tried to "reach for" or "catch" Client before she fell on the floor. When Parel's counsel asked about her prior inconsistent statements, Parel replied "What I'm saying is the truth." After Client's fall, Parel told Mamhot that she "was sorry that her mom had a seizure and fell down and I tried to catch her." The next day, Parel again apologized to Client's daughter.

Following Parel's testimony, DHS and Parel's counsel restated their respective positions and the Hearing Officer concluded the Hearing. On November 30, 2012, Hearing Officer issued the Hearing Decision. The Hearing Officer determined that DHS properly confirmed that Parel had committed caregiver neglect.

On December 24, 2012, Parel filed a Notice of Appeal to Circuit Court under HRS § 91-14 and Hawai'i Rules of Civil Procedure Rule 72. After briefing and oral argument, the Circuit Court affirmed the Hearing Decision and determined that "reversal or modification of the administrative hearing decision is not

warranted under the standards set forth in [HRS] section 91-14(g)[.]" The Circuit Court entered the Order on August 30, 2013.

On October 22, 2013, the Circuit Court entered the Judgment. On November 21, 2013, Parel filed her notice of appeal.

II. POINTS OF ERROR

On this appeal, Parel identifies three points of error, summarized as follows: (1) DHS violated its statutory authority by holding an administrative hearing and finding that Parel committed caregiver abuse; and (2 & 3) the Hearing Decision was clearly erroneous and constituted an abuse of discretion.

III. APPLICABLE STANDARD OF REVIEW

"The review of a circuit court's decision regarding its review of an administrative agency's decision is a secondary appeal." Pila'a 400, LLC v. Bd. of Land & Nat. Res., 132 Hawai'i 247, 262, 320 P.3d 912, 927 (2014) (citing Haw. Teamsters & Allied Workers, Local 966 v. Dep't of Labor & Indus. Relations, 110 Hawai'i 259, 265, 132 P.3d 368, 374 (2006)).

> "On secondary judicial review of an administrative decision, Hawaii appellate courts apply the same standard of review as that applied upon primary review by the circuit court." Kaiser Found. Health Plan, Inc. v. Dep't of Labor & Indus. Relations, 70 Haw. 72, 80, 762 P.2d 796, 800-01 (1988). For administrative appeals, the applicable standard of review is set forth in HRS § 91-14(g) (2004), which provides:
>
> > Upon review of the record the court may affirm the decision of the agency or remand the case with instructions for further proceedings; or it may reverse or modify the decision and order if the substantial rights of the petitioners may have been prejudiced because the administrative findings, conclusions, decisions, or orders are:
> >
> > (1)  In violation of constitutional or statutory provisions; or

> (2)   In excess of the statutory authority or jurisdiction of the agency; or
>
> (3)   Made upon unlawful procedure; or
>
> (4)   Affected by other error of law; or
>
> (5)   Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or
>
> (6)   Arbitrary, capricious, or characterized by abuse of discretion or clearly unwarranted exercise of discretion.
>
> Pursuant to HRS § 91-14(g)(5),
>
> administrative findings of fact are reviewed under the clearly erroneous standard, which requires [the appellate] court to sustain its findings unless the court is left with a firm and definite conviction that a mistake has been made. Administrative conclusions of law, however, are reviewed under the de novo standard inasmuch as they are not binding on an appellate court. Where both mixed questions of fact and law are presented, deference will be given to the agency's expertise and experience in the particular field and the court should not substitute its own judgment for that of the agency. To be granted deference, however, the agency's decision must be consistent with the legislative purpose.
>
> Peroutka v. Cronin, 117 Hawai'i 323, 326, 179 P.3d 1050, 1053 (2008) (citations and internal quotation marks omitted).

AlohaCare v. Ito, 126 Hawai'i 326, 341, 271 P.3d 621, 636 (2012).

IV.   DISCUSSION

Parel argues that: (1) DHS violated its statutory mandate by holding an administrative hearing; (2) DHS lacked the regulatory authority to conduct an administrative hearing; (3) her due process rights were violated; and (4) the Hearing Decision was clearly erroneous and constituted an abuse of discretion.

A.   Statutory Authority

Parel argues that DHS "violated its statutory mandate by conducting an administrative hearing instead of following the

applicable statute and pursuing the matter in the Family Court[.]" DHS contends that Parel did not raise this argument before the Circuit Court and thus, the argument is waived on appeal. However, the "lack of jurisdiction over the subject matter cannot be waived by the parties." <u>Chun v. Emps.' Ret. Sys. of the State of Hawaii</u>, 73 Haw. 9, 14, 828 P.2d 260, 263 (1992) (quoting <u>In re Application of Rice</u>, 68 Haw. 334, 335, 713 P.2d 426, 427 (1986)). Thus, we consider Parel's argument.

Under HRS § 346-227 (2015), DHS is required to initiate an investigation upon receiving a report of abuse[2] of a vulnerable adult.[3] An investigation is defined as "the professional and systematic gathering and evaluation of information about the vulnerable adult for the purpose of making decisions regarding confirmation of abuse, protection of the

---

[2]     Pursuant to HRS § 346-222 (2015):

> "Abuse" means any of the following, separately or in combination:
>
> (1)     Physical abuse;
> (2)     Psychological abuse;
> (3)     Sexual abuse;
> (4)     Financial exploitation;
> (5)     Caregiver neglect; or
> (6)     Self-neglect;
>
> each as further defined in this chapter. Abuse does not include, and a determination of abuse shall not be based solely on, physical, psychological, or financial conditions that result when a vulnerable adult seeks, or when a caregiver provides or permits to be provided, treatment with the express consent of the vulnerable adult or in accordance with the vulnerable adult's religious or spiritual practices.

[3]     HRS § 346-222 defines a "vulnerable adult" as a person eighteen years of age or older who, because of mental, developmental, or physical impairment is unable to:

(1)     Communicate or make responsible decisions to manage the person's own care or resources;
(2)     Carry out or arrange for essential life activities of daily living; or
(3)     Protect oneself from abuse, as defined in this part.

vulnerable adult, and the provision of services for the vulnerable adult." HAR § 17-1421-2 (2009). Following an investigation:

> [DHS] shall take action to prevent abuse and shall have the authority to do any or all of the following:
> (1) Resolve the matter in an informal fashion as is appropriate under the circumstances;
> (2) Exercise its right of entry under section 346-229;
> (3) Seek an order for immediate protection;
> (4) Seek a temporary restraining order;
> (5) File a petition with the court under this part; and
> (6) Seek any protective or remedial actions authorized by law.

HRS § 346-228 (2015).

On appeal, Parel argues that DHS was "statutorily required to conduct further proceedings in the applicable Family Court." In support of her argument, Parel relies on HRS § 346-223 (2015), which states:

> The family court shall have jurisdiction over protective proceedings under this part that concern a vulnerable adult who was or is found within the judicial circuit at the time the facts and circumstances occurred, were discovered, or were reported to the department, which constitute the basis for a finding that the vulnerable adult has incurred abuse or is in danger of abuse if immediate action is not taken; provided that the protective proceedings under this part shall not be considered exclusive and shall not preclude any other criminal, civil, or administrative remedy. The protective proceedings under this part shall be held in the judicial circuit in which the vulnerable adult resides at the time of the filing of the petition or in which the vulnerable adult has assets.

(Emphasis added).

However, pursuant to HRS § 346-228 (as quoted above), following an investigation of a report alleging abuse, DHS is authorized, but not required, to seek an order of immediate protection or file a petition with family court. DHS submits that it did not file a protective proceeding in Family Court because Parel was suspended from her position at the Facility and

Client was moved to a different wing of the facility. Thus, Family Court intervention was not necessary to protect the Client.

Even if DHS had filed a protective proceeding, HRS § 346-223 clearly provides that "the protective proceedings under this part shall not be considered exclusive and shall not preclude any other criminal, civil, or administrative remedy." It is well established that "the fundamental starting point for statutory interpretation is the language of the statute itself[,]" and "where the statutory language is plain and unambiguous, our sole duty is to give effect to its plain and obvious meaning." Haw. Gov't Emps. Ass'n, AFSCME Local 152 v. Lingle, 124 Hawai'i 197, 202, 239 P.3d 1, 6 (2010) (quoting Awakuni v. Awana, 115 Hawai'i 126, 133, 165 P.3d 1027, 1034 (2007)). Under the plain language of HRS § 346-223, a family court action is not mandated. Parel fails to provide any further argument supporting her assertion that DHS was statutorily required to conduct further proceedings in family court. Therefore, we conclude that Parel's argument is without merit.

B.    Regulatory Authority

Parel next argues that DHS failed to adopt any administrative rules or amend existing rules that would allow it to conduct administrative hearings into allegations of abuse, raising three contentions:  (1) DHS was required to file an action in Family Court under HAR § 17-1421-11 (2009); (2) DHS did not adopt "established hearing procedures" as required by HAR

§ 17-1421-9.1(c)(3); and (3) DHS "failed to promulgate criteria and standards concerning what would constitute 'caregiver abuse.'"

First, HAR § 17-1421-11 provides that DHS "shall initiate court action by petitioning for an order for immediate protection when, in accordance with sections 346-231 and 346-232, HRS, [DHS] determines that there is a reason to believe the vulnerable adult has incurred abuse or is in danger of abuse if immediate action is not taken." HRS § 346-231 (2015) pertains to an order for immediate protection. HRS § 346-232 (2015) pertains to an order to show cause hearing following the issuance of an order for immediate protection. As discussed above, DHS is authorized, but not required, to seek an order of immediate protection in Family Court. HRS § 346-228. Therefore, we conclude that Parel's first contention is without merit.

Second, Parel contends that DHS did not adopt "established hearing procedures" as required by HAR § 17-1421-9.1(c)(3). DHS argues that Parel did not raise this argument before the Circuit Court, and thus, the argument is waived on appeal. An appellate court "will consider new arguments on appeal where justice so requires." State v. Moses, 102 Hawai'i 449, 456, 77 P.3d 940, 947 (2003). "[T]he appellate court's discretion to address plain error is always to be exercised sparingly." Okada Trucking Co., v. Bd. of Water Supply, 97 Hawai'i 450, 458, 40 P.3d 73, 81 (2002). An appellate court considers three factors in its decision to review an issue for plain error, "(1) whether consideration of the issue not raised

at trial requires additional facts; (2) whether its resolution will affect the integrity of the trial court's findings of fact; and (3) whether the issue is of great public import." Id. (citation omitted).

The first factor is "based on the tenet that an appellate court should not review an issue based upon an undeveloped factual record." Alvarez Family Tr. v. Ass'n of Apartment Owners of the Kaanapali Alii, 121 Hawai'i 474, 490, 221 P.3d 452, 468 (2009) (citation and internal quotation marks omitted). Parel's contention that DHS failed to adopt "established hearing procedures" under HAR § 17-1421-9.1(c)(3) is a question of law, and thus, will not require additional facts.

With regard to the second factor, the Circuit Court "[u]pon review of the administrative hearing decision, the evidence presented, and the applicable statutes and administrative rules," determined that "reversal or modification of the administrative hearing decision is not warranted under the standards set forth in [HRS] section 91-14(g)[.]" Thus, "there are no findings of fact whose integrity could be affected by the instant appeal[.]" Alvarez, 121 Hawai'i at 491, 221 P.3d at 469 (internal quotation marks omitted). Therefore, the second factor is not applicable. Id.

As to the third factor, the Hawai'i Supreme Court has observed that "in civil cases, an issue is of 'great public import' for the purposes of plain error review only when such issue affects the public interest." Id. In Alvarez, the supreme court determined that the issue of whether appellants had the

15

right to challenge the voting procedures of a condominium association's board of directors was not a matter of "public interest" because "(1) such right is of a private nature and (2) the issue applies exclusively to the facts and circumstances of [appellant's] case." Id. at 492, 221 P.3d at 470.

Here, Parel contends that DHS failed to establish hearing procedures under HAR § 17-1421-9.1(c), which requires DHS to issue a disposition following an investigation of a report alleging abuse. The disposition must include the "identified perpetrator's right to appeal [DHS's] disposition through established hearing procedures." HAR § 17-1421-9.1(c). An identified perpetrator's right to appeal a DHS disposition under HAR § 17-1421-9.1(c) is not an issue that applies exclusively to the facts and circumstances of Parel's case. Alvarez, 121 Hawai'i at 492, 221 P.3d at 470. Thus, the third factor of the plain error test is satisfied. Upon consideration of the three factors, we conclude that plain error review is not inappropriate and will consider Parel's argument that DHS failed to adopt "established hearing procedures" as required by HAR § 17-1421-9.1(c)(3).

Pursuant to HAR § 17-1421-9.1(c)(3), DHS is required to "provide a written notice on a prescribed department form to the identified perpetrator(s) of the disposition of the investigation." The written notice must include: (1) "[t]he department's decision to confirm or not confirm the allegations of vulnerable adult abuse"; (2) "[t]he specific rules supporting the action"; and (3) "[t]he identified perpetrator's right to

appeal the department's disposition through established hearing procedures." HAR § 17-1421-9.1(c).

In the instant case, DHS issued its Notice of Disposition confirming caregiver neglect by Parel under HAR § 17-1421-9.1, including notice to Parel of her right to appeal. The Notice of Disposition provides:

> WHAT TO DO IF YOU DO NOT AGREE WITH THIS DECISION: You have a right to a meeting with a representative of the Department's local office to discuss the disposition. At the meeting, you may speak for yourself or be represented by an attorney, friend, or other person. You also have a right to ask for an administrative hearing. Your request for an administrative hearing must be in writing. Please use the attached form DHS 1617 to request an administrative hearing and send the form to the address at the top of the form. The Department must receive your written request for an administrative hearing within 90 calendar days of the date of this notice in order for you to receive a hearing.

Parel completed the DHS 1617 form, and requested an administrative hearing to contest DHS's determination of caregiver neglect. DHS sent a Hearing Notice to inform Parel that her hearing was scheduled for November 8, 2012. The Hearing Notice also notified Parel that the "hearing will be held on an informal basis in accordance with Chapter 91 of the [HRS] and Chapters 17-2 and 17-1402 of the [HAR]."

In Valdez, appellant challenged DHS's determination that she abused a vulnerable adult. Valdez v. State, Dep't of Human Serv., No. CAAP-12-0000121, 2014 WL 7190243, at *1 (Haw. App. Dec. 17, 2014) (SDO). Appellant's hearing notice referred to HRS chapter 91 and HAR § 17-1402, but failed to mention HAR § 17-2. Id. Appellant argued that "she did not know which procedures to follow prior to the DHS hearing and, more specifically, that she did not know that she could subpoena

17

witnesses." Id. This court determined that DHS "erred in referencing HAR § 17-1402, where the 'right to a hearing' is described as applying to an 'applicant for or recipient of public assistance.'" Id. (citing HAR § 17-1402-4). However, this court concluded that appellant's "substantial rights were not affected by the deficient notice and that her failure to raise an objection constituted a waiver of her right to subsequently complain about the absence of the witnesses." Id. (Footnote and citations omitted).

As in Valdez, DHS improperly referenced HAR § 17-1402 in its Hearing Notice. However, Parel was also notified that the hearing will be held in accordance with HAR chapter 17-2. HAR chapter 17-2 contains rules pertaining to notice requirements for an administrative hearing (HAR § 17-2-8 (1995)), powers of the hearing officer in conducted hearings (HAR § 17-2-12 (1995)), and rights of the parties at a hearing (HAR § 17-2-16 (1995)). Parel's counsel did not raise the issue of the applicability of HAR chapter 17-2 at any point during the Hearing.[4] Parel's counsel actively participated at the Hearing. Parel's counsel submitted exhibits as evidence, and also questioned APS Specialist Kageyama and Parel at the Hearing. In sum, Parel was clearly notified that the Hearing would be held in accordance with HAR chapter 17-2, and failed to contest the established

---

[4] For the first time in her reply brief on appeal, Parel argues that no administrative rule, including HAR chapter 17-2, "applies to an administrative hearing concerning an appeal of a departmental finding of 'abuse.'" However, this argument is waived. In re Hawaiian Flour Mills, Inc., 76 Hawai'i 1, 14 n.5, 868 P.2d 419, 432 n.5 (1994) (recognizing that arguments raised for the first time in the reply briefs on appeal were deemed waived); see also Hawai'i Rules of Appellate Procedure Rule 28(b)(4).

procedures outlined in HAR chapter 17-2. Based on the foregoing, we are not persuaded by Parel's contention that DHS failed to adopt and follow established hearing procedures, as required by HAR § 17-1421-9.1(c)(3).

Lastly, Parel contends that DHS "had a statutory obligation [under HRS § 346-47 (2015)] to establish criteria or standards through administrative rulemaking . . . by which 'caregiver abuse,' especially 'neglect' could be determined." In support of this contention, Parel relies significantly on Aluli v. Lerwin, 73 Haw. 56, 828 P.2d 802 (1992). In Aluli, the Department of Health (DOH) issued an air pollution permit which authorized construction and operation of geothermal wells. Id. at 57, 828 P.2d at 803. Appellants contended that DOH erred in issuing the permit where "there were no rules promulgated in accordance with the Hawaii Administrative Procedure Act, Chapter 91, [HRS], governing the issuance of such permits" under HRS § 342B-32 (Supp. 1991).[5] Id. At the time Aluli was decided, HRS § 342B-32 provided:

> The director [of health] may require private persons or agencies or governmental agencies engaged or desiring to engage in operations which result or may result in air pollution to secure a permit prior to installation or operation or continued operation. The director shall refuse to issue the permit unless it appears that the operations would be in compliance with the rules of the department and the state ambient air quality standards. . . .

The supreme court reversed the circuit court's determination that administrative rules were unnecessary. Id. The supreme court concluded that "DOH could not issue a permit

---

[5] Although HRS § 342B-32 was amended significantly in 1992, we reference the 1991 cumulative supplement for purposes of comparing Aluli to the instant case. See, 1992 Haw. Sess. Laws Act 240, § 32 at 629-30.

where the statute only authorizes the issuance of a permit in accordance with rules, and the rules had yet to be propagated." Pila'a 400, 132 Hawai'i at 265 n.26, 320 P.3d at 930 n.26 (citing Aluli, 73 Haw. at 61, 828 P.2d at 805).

Parel's reliance on Aluli is misplaced. In Aluli, the supreme court based its decision on the provision of HRS § 342B-32, which required DOH to "refuse to issue the permit unless it . . . would be in compliance with the rules of the department and the state ambient air quality standards." Id. at 58, 808 P.2d at 803. HRS § 342B-32 is notably distinguishable from HRS § 346-47, which provides:

> The department shall adopt rules pursuant to chapter 91 relating to:
> (1)  The investigation of:
>     (A)   Abuse or neglect by a [CNA] working in a health care setting licensed or certified by the department; and
>           . . . .
> (2)  Action taken against a [CNA] as a result of an investigation pursuant to paragraph (1).

Unlike HRS § 342B-32, HRS § 346-47 does not require the promulgation of criteria or standards through rulemaking. HRS § 346-47 "contains only a general mandate" that DHS adopt rules related to (1) the investigation of abuse or neglect by a CNA, and (2) action taken against a CNA as a result of an investigation. See, e.g., Pila'a 400, 132 Hawai'i at 264-65, 320 P.3d at 929-30. DHS complied with this general mandate through the promulgation of HAR chapter 17-1421. HAR chapter 17-1421 contains rules regarding the components of an investigation (HAR § 17-1421-9 (2009)), and the disposition and notice of an investigation (HAR § 17-1421-9.1). Furthermore,

> [t]here are no principles of construction which prevent the
> utilization by the courts of subsequent enactments or
> amendments as an aid in arriving at the correct meaning of a
> prior statute, and it is very common for a court, in
> construing a statute, to refer to subsequent legislation as
> impliedly confirming the view which the court has decided to
> adopt.

Gomes v. Campbell, 37 Haw. 252, 257 (Haw. Terr. 1945) (quoting 50 Am. Jur. Statutes, § 337).

We also note that, in 2016, the Legislature repealed HRS § 346-47. 2016 Haw. Sess. Laws Act 21, § 5 at 26. The House Committee on the Judiciary recommended the repeal of HRS § 346-47 because it was "duplicative of the authority granted to the Department [of Human Services] by other existing statutory provisions." H. Stand. Comm. Rep. No. 1459-16, 28th Leg., (2016), available at http://www.capitol.hawaii.gov/session2016/CommReports/SB2874_HSCR 1459-16_.htm. This action lends further support to the conclusion that DHS was not required to establish particularized criteria and standards.

C.  Due Process

Parel asserts that she has a "constitutionally protected due process right to have the Hearing Officer adhere to the existing rules." In particular, she contends that she was "entitled to have the charges of abuse and patient neglect heard by a competent, unbiased and objective adjudicator." Parel asserts that the Hearing Officer "simply concluded if the patient fell, then [Parel] was at fault." Parel submits that the Hearing Officer's conclusion was "highly speculative" and unsupported by evidence.

The Hawai'i Constitution provides, *inter alia*: "No person shall be deprived of life, liberty or property without due process of law. . . ." Haw. Const. art. I, § 5. The basic principles of procedural due process require "notice and an opportunity to be heard at a meaningful time and in a meaningful manner." Mauna Kea Anaina Hou v. Bd. of Land & Nat. Res., 136 Hawai'i 376, 389, 363 P.3d 224, 237 (2015) (citing Sandy Beach Def. Fund v. City & Cty. of Honolulu, 70 Haw. 361, 378, 773 P.2d 250, 261 (1989)).

In Mauna Kea, the Board of Land and Natural Resources (BLNR) approved a permit for a proposed astronomy observatory, ancillary facilities, and access roads on the upper slopes of Mauna Kea. Id. at 381, 383, 363 P.3d at 229, 231. The issue on appeal was "whether the approval of the permit before the contested case hearing was held violated the Hawai'i Constitution's guarantee of due process[.]" Id. at 380, 363 P.3d at 228. The supreme court stated: "In an adjudicatory proceeding before an administrative agency, due process of law generally prohibits decisionmakers from being biased, and more specifically, prohibits decisionmakers from prejudging matters and the appearance of having prejudged matters." Id. at 389, 363 P.3d at 237. Additionally, "if there exists any reasonable doubt about the adjudicator's impartiality at the outset of a case, provision of the most elaborate procedural safeguards will not avail to create [an] appearance of justice." Id. at 390, 363 P.3d at 238 (brackets in original) (quoting Sussel v. City & Cty. of Honolulu Civil Serv. Comm'n, 71 Haw. 101, 108, 784 P.2d 867,

870 (1989)). The supreme court held that the "procedural protections that were afforded during the contested case process simply cannot remedy the fact that the decisionmaker appeared to have already decided and prejudged the matter at the outset." Id. at 391, 363 P.3d at 239. Accordingly, the supreme court concluded that BLNR's decision to approve the permit prior to the contested case hearing denied appellants the "most basic element of procedural due process-an opportunity to be heard at a meaningful time and in a meaningful manner." Id.

In this case, at the outset of the Hearing, the Hearing Officer informed Parel that he was not involved in DHS's investigation, and that his decision would be based on the evidence presented. Parel fails to cite any evidence that the Hearing Officer was biased, or had made any preliminary determinations. Moreover, Parel was provided with notice of the hearing, and had a meaningful opportunity to be heard. On October 22, 2012, DHS sent a Hearing Notice to inform Parel that her hearing was scheduled for November 8, 2012. The Hearing Notice also provided that the "hearing will be held on an informal basis in accordance with Chapter 91 of the [HRS] and Chapters 17-2 and 17-1402 of the [HAR]." At the Hearing, Parel's counsel entered exhibits as evidence, cross-examined witnesses under oath, and presented arguments in favor of Parel's position. Following the Hearing, the Hearing Officer issued his Hearing Decision after "carefully review[ing] all evidence, administrative rules and policy clarifications[.]" The Hearing Decision informed Parel of her ability to "file a notice of

appeal in circuit court within thirty (30) days after service of the certified copy of the decision." As Parel had notice and meaningful opportunity to be heard, we cannot conclude that her due process rights were violated.

D.     The Hearing Officer's Findings

Finally, Parel contends that the Hearing Decision was "clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record[.]" Parel asserts that the Hearing Officer "simplistically determined that [Client] would not have fallen if [Parel] had been standing in front of her and the fact that [Client] fell meant that [Parel] had not been standing in front of [Client]."

"An agency's findings, if supported by reliable, probative and substantial evidence, will be upheld." In re Hawaii Elec. Light Co., 60 Haw. 625, 630, 594 P.2d 612, 617 (1979) (citing HRS § 91-14(g) (1976)). Furthermore,

> [i]t is well established that courts decline to consider the weight of the evidence to ascertain whether it weighs in favor of the administrative findings, or to review the agency's findings of fact by passing upon the credibility of witnesses or conflicts in testimony, especially the findings of an expert agency dealing with a specialized field.

Moi v. Dep't of Safety, 118 Hawaiʻi 239, 242, 188 P.3d 753, 756 (App. 2008) (quoting Nakamura v. State, 98 Hawaiʻi 263, 268, 47 P.3d 730, 735 (2002)).

Parel argues that the Hearing Officer ignored her "statement and testimony at the hearing that she was directly in front of the patient and turned to get the gait belt." On the contrary, it appears from the Hearing Decision that the Hearing Officer considered Parel's testimony. At the hearing, Parel

testified that she "saw [Client] standing -- like I saw in the side of my eye she was standing, and then when I turned around she was just like . . . [h]aving a seizure[.]" In the Hearing Decision, the Hearing Officer referenced Parel's testimony that she saw "Client standing 'from the side of my eye'" and that "'she turned around' and saw Client having a seizure." Based on Parel's testimony, the Hearing Officer determined that Parel was not "standing directly in front of Client as procedure dictated but to the side" and accordingly, that Parel "did not follow proper procedure in effecting Client's transfer which resulted in [Parel] being unable to prevent Client's fall." This court will decline to re-weigh the evidence or disturb the agency's credibility determinations. Moi, 118 Hawai'i at 242, 188 P.3d at 756. Rather, "we generally defer to the agency's expertise and experience rather than 'substitut[ing our] own judgment for that of the agency.'" Valdez, 2014 WL 7190243 at *4 (brackets in original) (quoting Igawa v. Koa House Rest., 97 Hawai'i 402, 406, 38 P.3d 570, 574 (2001)). Viewing the reliable, probative, and substantial evidence, with the Hearing Officer determining credibility and the weight of the evidence, we cannot conclude that the Hearing Officer's decision was clearly erroneous.

V.     CONCLUSION

For these reasons, the Circuit Court's October 22, 2013 Judgment is affirmed.

DATED: Honolulu, Hawaii, January 19, 2017.

On the briefs:

Ted H.S. Hong,
for Appellant-Appellant.

Heidi M. Rian,
Candace J. Park,
Deputy Attorneys General,
for Appellee-Appellee.

Presiding Judge

Associate Judge

Associate Judge